# In the United States Court of Federal Claims

No. 23-1987

(Filed: 29 January 2025)

```
*************************************
THE KENNEDY COLLECTIVE,              *
                                     *
                 Plaintiff,          *
                                     *
v.                                   *
                                     *
THE UNITED STATES,                   *
                                     *
                 Defendant.          *
                                     *
*************************************
```

  *Thomas S. Lambert*, with whom was *Richard C. Robinson*, Pullman & Comley, all of Hartford, CT, for plaintiff.

  *Joshua N. Schopf*, Trial Attorney, with whom was *Andrew J. Hunter*, Trial Attorney, *Albert S. Iarossi*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for the government.

## ORDER

**HOLTE**, **Judge.**

  In the words of Justice Byron White writing for a unanimous Supreme Court and citing the Restatement of Contracts, "a court should provide a remedy *if* the parties intended to make a contract and the contract's terms provide a sufficiently certain basis for determining both that a breach has in fact occurred and the nature of the remedy called for." *Texas v. New Mexico*, 482 U.S. 124, 129 (1987) (citing Restatement (Second) of Contracts § 33(2), and Comment *b* (1981)) (emphasis added). On opposite sides of the gridiron is a dispute as to whether the parties intended a blanket purchase agreement to be a binding contract with minimum purchase requirement and enforceable cost-sharing provisions. Although plaintiff's playbook would have the Court construe the blanket purchase agreement as a binding contract, the government urges the Court to find the agreement was merely a framework to set up a level playing field for *future* contracts. Echoing the Whizzer,[1] the Court finds the parties' blanket purchase agreement can neither constitute a binding contract, nor "provide a sufficiently certain basis" to warrant relief.

---

[1] During his outstanding academic and athletic career as valedictorian at the University of Colorado, and prior to being a first-round NFL pick for the Pittsburg Pirates (now Steelers), Justice White earned the nickname the Whizzer, "a nickname that followed him throughout his life . . . ." *See* Life Story: 1917–1993 Byron R. White, S. CT. HIST. SOC'Y, https://civics.supremecourthistory.org/article/byron-r-white/ (last visited 29 January 2025).

During the federal government's initial response to the COVID-19 pandemic, the National Oceanic and Atmospheric Administration exercised emergency authority to source personal protective equipment and cleaning supplies for the agency's future needs. The agency awarded a blanket purchase agreement to the Kennedy Collective with an estimated value of $13 million. The agreement set forth a framework for the agency to place "call orders" with Kennedy for supplies under a tiered delivery schedule. As a practical matter, Kennedy needed to have inventory on-hand to fulfill the most urgent orders. Accordingly, Kennedy pre-purchased $2.1 million in startup inventory. Although the agency extended the blanket purchase agreement twice, the agency placed only $609,214 worth of orders over a three-year span. Much of Kennedy's inventory expired, resulting in disposal costs exceeding $380,000. Kennedy sought monetary relief for its inventory and disposal costs, which the agency denied. The government filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). Arguing the terms of the blanket purchase agreement make clear the parties did not intend to make the agreement a binding contract, the government urges the Court to find Kennedy's claims fall outside of this court's jurisdiction. For the following reasons, the Court grants the government's Motion to Dismiss.

**I.     Factual Background**

The Kennedy Collective ("Kennedy") is a non-profit corporation "support[ing] individuals with intellectual and other types of disabilities." *See* Compl. at ¶ 1, ECF No. 1. In furtherance of this mission, Kennedy serves as a product distribution contractor to third parties for employing disabled persons in its distribution efforts. *See id.* On 18 June 2020, during the early response to the COVID-19 pandemic, the National Oceanic and Atmospheric Administration ("NOAA") exercised emergency authority to issue a request for quote ("RFQ") for a blanket purchase agreement ("the BPA") related to personal protective equipment ("PPE") and cleaning supplies. *See id.* ¶ 19. Kennedy responded to the RFQ, and on 1 July 2020, won the BPA with NOAA. *See id.*; Gov't Mot. to Dismiss ("MTD") at 2, ECF No. 7. Per the RFQ, the "cumulative estimated value" of the BPA was "$13 million."[2] *See* Compl. at ¶ 20.

NOAA awarded the BPA to Kennedy when holding "emergency authority" to source COVID-19-related items and PPE. *See* 8 Oct. 2024 Oral Argument Tr. ("Tr.") at 56:22–57:1. This was the only BPA NOAA awarded for COVID-19 supplies. *See* Tr. at 9:2–6. The BPA provided a framework for NOAA to purchase supplies from Kennedy like "PPE, hand sanitizer, disinfectant wipes, and non-latex gloves." *See* Compl. at ¶ 19; *see also* Gov't MTD, Ex. 1 (BPA) at 13 (enumerating eight categories of "PPE Materials and Supplies" Kennedy was to have on hand for NOAA to order), ECF No. 7-1. The government uses BPAs in situations like this, where a federal agency seeks to create an open supply channel for goods when the quantity of goods needed to meet the agency's future needs is unknown. *See* Tr. at 56:19–22 ("[GOVERNMENT]:  [A] BPA has particular value in cases like this where there's an unknown quantity that is going to be necessary."). As such, a BPA is "a simplified purchasing device" used by the government to "lin[e] up a potential contractor" who agrees to supply specified types

---

[2] Although Kennedy argued it was implied from the text of the BPA the government should have ordered $13 million worth of PPE from Kennedy, when pressed at oral argument, Kennedy conceded it "would have taken $3 million . . . . $3 million would be very nice, and [the parties] wouldn't be here today if the [g]overnment [had] placed orders for $3 million . . . ." *See* Tr. at 14:7–10; 59:5–15.

- 2 -

of goods via "specific call orders" in the future.  *See* Tr. at 5:8–18.  Rather than going to a contractor every time the government needs a specific type of goods, a BPA allows the government to create an open supply channel without "having to start from the beginning" of the contracting process.  *See* Tr. at 5:19–24 ("Rather than every time they need to purchase a device . . . [like] in this case, masks, gloves, and personal protective equipment—every time they need a particular type of product having to . . . start from the beginning, all of the framework is already in place."); *see also* Tr. at 8:7–11 (agreeing "[a] BPA typically serves as a purchase agreement framework for future purposes"); Tr. at 8:12–9:1 ("[THE GOVERNMENT:] There are examples . . . with firefighting . . . [where] [t]he [g]overnment does not know if there are going to be wildfires, so . . . they will use a blanket purchase agreement.  THE COURT: So possibility situations?  [GOVERNMENT]:  Possibilities, where there might be future contracts, but it's just unknown at the time, generally speaking.").  During the COVID-19 pandemic, NOAA entered into the BPA with Kennedy because NOAA "wanted to use a simplified process to acquire, if necessary, the [PPE] [NOAA] needed" in the future.  *See* Tr. at 57:9–11.

      The BPA lays a framework for NOAA to purchase supplies by placing a call order to Kennedy for specific type(s) and amount(s) of PPE supplies.  *See* Compl. at ¶¶ 20–22; *see also* Gov't MTD, Ex. 1 (BPA) at 12–13.  In an individual call order, NOAA is required to specify "[a]ll applicable deliverables and their required delivery dates, destination of delivery, and schedule for delivery."  Gov't MTD, Ex. 1 (BPA) at 13.  The parties agree the terms of the BPA listed "0.00" as the amount of each type of goods NOAA was required to purchase from Kennedy.  *See* Compl. at ¶ 5 ("[T]he contract between Kennedy and [] NOAA did not compel [] NOAA to make any purchase . . . ."); Gov't MTD at 2 (arguing the BPA had no minimum purchase requirement because the listed quantity is "0.00" under the required "Amount" to be purchased column); *see also* Gov't MTD, Ex. 1 (BPA) at 3–7.  The BPA utilizes a tiered delivery schedule, where Tier 1 deliveries are the most urgent, thus mandating Kennedy to deliver a Tier 1 order within five-to-ten days.  *See* Compl. at ¶ 22; *see also* Gov't MTD, Ex. 1 (BPA) at 12.  In anticipation of the Tier 1 orders, Kennedy had to have inventory on hand to be able to meet an order under the Tier 1 delivery schedule.  *See* Compl. at ¶¶ 23–24.  For Tier 7 deliveries, in contrast, Kennedy could deliver the goods "within 91+ days of a Call Order" if Kennedy "provide[d] the [g]overnment with a schedule between 90 – 180 days" of when Kennedy anticipated delivery to occur.  Gov't MTD, Ex. 1 (BPA) at 12.  NOAA also held the "unilateral ability to designate the Tier or Tiers applicable to any particular Call Order."  Compl. at ¶¶ 22–23.

      Kennedy purchased about $2.1 million worth of inventory in anticipation of potential Tier 1 call orders from NOAA.  *See* Compl. at ¶ 24.  When NOAA awarded the BPA, Kennedy was aware it would have to pre-purchase supplies to meet the Tier 1 delivery schedules.  *See* Tr. at 62:3–6 ("THE COURT:  When Kennedy agreed to the BPA, did Kennedy know that it would have to prepurchase supplies to meet the tier one delivery schedules?  [PLAINTIFF]:  Yes.").  NOAA did not give any indication of its needs to Kennedy beyond what is listed in the Solicitation.  *See* Tr. at 65:5–12.  During the first year under the BPA, NOAA experienced a "ramp-up" in its need for PPE and placed several call orders to Kennedy.  *See* Tr. at 55:24–56:2.  Specifically, NOAA placed $609,214 worth of call orders to Kennedy under the BPA, "with the last delivery occurring in September 2020."  *See* Compl. at ¶¶ 6, 24–25; *see also* Gov't MTD, Ex. 2 (Final Decision Letter) ¶ 3, ECF No. 7-2; Gov't MTD at 3.  The parties agree NOAA

placed about 28 total call orders. *See* Tr. at 66:1–14 ("[THE COURT:] [H]ow many specific individual call orders were placed? . . . [GOVERNMENT]: [T]here were 28 individual call orders. They range from $1,000 to over $100,000. THE COURT: [Plaintiff], does that sound correct? [PLAINTIFF]: I don't know. THE COURT: Sounds reasonable? . . . [PLAINTIFF]: Sounds reasonable to us."). The government explained at oral argument, NOAA's need for PPE then diminished after NOAA had placed $600,000 worth of orders. *See* Tr. at 55:13–56:2.

The period of performance under the BPA was for one year from 2020–2021, and despite NOAA's diminished need for PPE over time, NOAA exercised its option to extend the BPA by a year for the 2021–2022 term, and again for the 2022–2023 term. *See* Compl. at ¶ 20 ("NOAA had two options to extend the [BPA] for a year at a time and chose to exercise both."); *see also* Gov't MTD, Ex. 1 (BPA) at 58, Cl. 1352.270-70(a) ("The base period of performance of this contract is from July 01, 2020 through June 30, 2021. If an option is exercised, the period of performance shall be extended through the end of that option period."); Gov't MTD, Ex. 2 (Final Decision Letter) at ¶ 1 ("The BPA had a one-year period of performance beginning in July 1, 2020, and two one-year option periods.").

Kennedy alleges NOAA misled Kennedy into thinking more orders would be forthcoming by exercising the options to extend, which is why Kennedy purchased inventory in advance. *See* Compl. at ¶ 7. At no point during the parties' business relationship, however, did NOAA give any indication of its needs to Kennedy beyond what is listed in the Solicitation. *See* Tr. at 65:5–12 ("[THE COURT:] [D]id NOAA give any indication beyond what's listed in the BPA of specific needs? [PLAINTIFF]: I don't think they . . . indicate[d] the number . . . (Counsel conferring.) . . . No, nothing other than what's in the solicitation."). At oral argument, the government represented that NOAA placed orders to Kennedy after the first extension period. *See* Tr. at 48:19–49:6 ("THE COURT: . . . From the [g]overnment's perspective, when [the BPA] was extended twice, did the [g]overnment have any discussion with Kennedy regarding its decision to extend? [GOVERNMENT]: . . . Not that I'm aware of, no. I do have information that -- despite what Plaintiff says-- call orders were actually placed beyond the first year of the term. So [the BPA] was extended, the options were placed, and there were some call orders after that point. THE COURT: So some call orders were placed during the extension period? [GOVERNMENT]: Yes."). Kennedy initially disagreed, arguing "no call orders [were] placed during [either of] the two one-year extensions," Tr. at 49:13–17, but later changed its position, conceding NOAA had placed a call order for $8,938.30 worth of PPE supplies during the first option period on 31 January 2022, Tr. at 54:12–17 ("I'm now told that there was a call order during the . . . [f]irst option year, for $8,938.30."). Beyond this example, nothing in the record indicates NOAA placed any orders after the 31 January 2022 call order, and the government agreed the record had no mention of the 31 January 2022 call order. *See* Tr. at 50:4–8 ("THE COURT: Can you cite in the record from the [g]overnment's perspective? [GOVERNMENT]: No . . . that was not in any of the motions.").

Given Kennedy purchased approximately $2.1 million in startup inventory, and NOAA only purchased $609,214 in goods over the three BPA terms, much of Kennedy's inventory sat on the shelves during the three BPA terms. *See* Compl. at ¶¶ 6, 24–25; *see also* Gov't MTD, Ex. 2 (Final Decision Letter) ¶ 3; Gov't MTD at 3; Tr. at 68:5–10 (discussing the "limited shelf life" of the PPE Kennedy purchased); Pl.'s Resp. to Gov't MTD ("Pl.'s Resp.") at 3, 10, ECF No. 9.

During this time, the expiration dates passed for most of the unpurchased PPE inventory. *See* Compl. at ¶¶ 25, 27. Kennedy's disposal cost for the expired goods exceeded $380,000. *See id.* Before the expiration of the PPE supplies, Kennedy communicated to NOAA the goods had a limited shelf life. *See* Tr. at 68:5–10 ("THE COURT: Did the PPE that Kennedy purchased have limited shelf life? [PLAINTIFF]: Yes. THE COURT: Did Kennedy communicate that limited shelf life to the [g]overnment? [PLAINTIFF]: Yes.").

    Even though Kennedy knew the good would expire and informed NOAA the goods would expire, *see* Tr. at 68:5–10, Kennedy did not take any efforts to mitigate the loss of these goods by selling to a different party before the goods expired, *see* Tr. at 61:9–12 ("[PLAINTIFF:] What we're really seeking is . . . the value of the inventory that we couldn't resell and the costs we have incurred to dispose of some of the product."). *See also* Compl. at ¶ 25 ("Worse yet, the expiration date has passed on much of the inventory that the NOAA failed to buy, and Kennedy must now dispose of that inventory at a cost that will exceed $380,000."); Gov't MTD, Ex. 2 (Final Decision Letter) at 1 ("Kennedy claimed that NOAA was liable for $1.8 million, which is comprised of inventory costs to fulfill the initial 6-12 months of anticipated orders and now a disposal fee of expired inventory (products with more than 70% alcohol considered to be hazardous waste)." (cleaned up)). Arguing it should not be responsible for any of the expired goods, the government points the Court to the relevant Federal Acquisition Regulation ("FAR") provisions included in the BPA. *See* Tr. 69:9–20 (explaining the risk of loss provisions assume the expiration of materials while in Kennedy's custody prior to a call order are not NOAA's responsibility); *see also* Gov't MTD at 8 ("[N]othing in the BPA required the [g]overnment to purchase Kennedy's stored inventory or assume responsibility for it in any way until a call order was placed and those goods were shipped to the [g]overnment."). The BPA set forth a Free On Board ("F.O.B." or "f.o.b.") Origin clause quoting FAR 52.247-29(b)(4)(i) in relevant part: "Contractor shall . . . [b]e responsible for any loss of and/or damage to the goods[] [o]ccurring before delivery to the carrier." *See* Gov't MTD, Ex. 1 (BPA) at 14–15. The BPA further included a "Risk of Loss Clause" provision quoting FAR 52.212-4(j): "Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until and shall pass to the [g]overnment upon: 1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or 2) Delivery of the supplies to the [g]overnment at the destination specified in the contract, if transportation is f.o.b. destination." *See id.* at 28.

    Kennedy disagreed, arguing it was exclusively NOAA's responsibility to mitigate the entire loss off all unpurchased and expired goods. *See* Tr. at 19:6–9, 42:17–22, 57:22–25. At oral argument, however, Kennedy's counsel was unsure as to what his client's understanding of the BPA's risk of loss and the F.O.B. clauses was at the time Kennedy entered into the BPA. *See* Tr. at 66:15–21 ("THE COURT: . . . When it entered into the BPA, what was Kennedy's understanding of the risk of loss and the FOB clauses in the BPA? [PLAINTIFF]: I don't know."). Kennedy still urged the Court to find an "*implied*" "obligation under the circumstances" on the part of the government "to do something to mitigate the losses that would naturally flow and did, in fact, flow to [Kennedy] as a result of the [g]overnment's change of mind." Tr. at 13:12–24 (emphasis added). The government acknowledged the risk of loss and F.O.B. clauses are the only provisions addressing loss in the BPA. *See* Tr. at 69:9–20

("[GOVERNMENT:] [T]hat's the only language in this BPA that speaks at all to [the issue of loss].").

On 22 March 2023—two and a half years after NOAA's last order—Kennedy submitted a request for equitable adjustment as an attempt to recover the costs of the extra inventory and disposal of the same. *See* Compl. at ¶¶ 8, 10. At the time of the equitable adjustment request, Kennedy estimated the sales value of its PPE inventory was "over $2.7 million." *See* Compl. at ¶ 24. On 3 April 2023, NOAA's Contracting Officer ("CO"), David Marks, denied Kennedy's equitable adjustment request via email. *See* Compl. at ¶¶ 10–11. Kennedy sought reconsideration of the CO's decision on 22 March 2023. *See id.* ¶ 12. Kennedy's request for reconsideration was denied on 3 April 2023. *See id.* On 12 June 2023, Kennedy filed a formal claim in this court seeking monetary relief of $1,837,612.98. *See id.* ¶ 13. Kennedy asserts the Court has subject-matter jurisdiction over its claims under 28 U.S.C. § 1491(a) and Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. *See id.* ¶ 9. On 31 July 2023, the CO issued a Final Decision Letter, denying Kennedy's request for equitable adjustment once again. *See* Compl. at ¶ 15; Gov't MTD at 3; Gov't MTD, Ex. 2 (Final Decision Letter). The CO's Final Decision Letter determined the BPA is not a contract, and therefore Kennedy's breach of contract and breach of the covenant of good faith and fair dealing claims are moot. *See* Gov't MTD, Ex. 2 (Final Decision Letter) ¶ 8.

## II.   Procedural History

On 15 November 2023, Kennedy filed its Complaint in this case.[3] *See* Compl. at 1. On 22 February 2024, the government filed its Motion to Dismiss. *See* Gov't MTD at 6–7. On 22 April 2024, Kennedy filed a response. *See* Pl.'s Resp. On 28 May 2024, the government filed its Reply. *See* Gov't Reply in Supp. of MTD ("Reply"), ECF No. 11. On 8 October 2024, the Court held substantive oral argument on the government's pending Motion to Dismiss. *See* 8 Oct. 2024 Order, ECF No. 13.

## III.   Parties' Arguments

In seeking monetary relief related to its inventory and disposal costs, Kennedy asks the Court to find the BPA was a binding contract, which obligated NOAA to purchase a substantial quantity of call orders, thereby making NOAA responsible for Kennedy's inventory and disposal costs associated with the unpurchased goods. *See* Pl.'s Resp. at 2–3. Kennedy seeks both an equitable adjustment of $1,837,612.98 for its inventory and disposal costs, and $1,837,612.98 in damages, alleging NOAA breached the covenant of good faith and fair dealing. *See* Compl. at ¶¶ 32, 40. The government counters, urging the Court to find the BPA was merely a framework for future orders and not a binding contract, thereby placing Kennedy's claims for monetary relief

---

[3] Kennedy failed to attach a copy of the BPA in its Complaint despite relying on the BPA as the basis for its claims. When asked by the Court why plaintiff did not attach the BPA to its original complaint, plaintiff's counsel stated he "didn't think [he] had to," and agreed the BPA attached to the government's Motion to Dismiss is the same BPA plaintiff discusses in its Complaint. *See* Tr. at 9:24–10:1 ("[THE COURT:] Does Kennedy agree that the BPA attached to the [g]overnment's motion to dismiss is the BPA at issue? [PLAINTIFF]: Yes.").

squarely outside of the Court's subject-matter jurisdiction and requiring the Court to dismiss the case. *See* Gov't MTD at 1–2, 5–6.

Kennedy argues the Tier 1 delivery schedule required Kennedy to preorder supplies in anticipation of call orders, thereby effecting a "constructive change" to the contract and entitling Kennedy to an equitable adjustment. *See* Pl.'s Resp. at 9–10. Under this theory, Kennedy contends it had "no practical or real ability . . . to refuse an order" and NOAA's "unilateral ability to require Kennedy to fill some potentially limitless number of [o]rders . . . mandated that Kennedy develop an inventory quickly and in very significant quantities," otherwise Kennedy would "have breached its duty to NOAA." *See id.* at 7. In reply, the government argues even if the BPA was a binding contract, the BPA's terms foreclose any finding of liability on NOAA's part as to the costs Kennedy incurred related to the unpurchased PPE and cleaning supplies, so the Court should still dismiss Kennedy's claims. *See* Gov't Reply at 4–5. According to the government, "there is no way for this Court to interpret the BPA as requiring a nonzero quantity of orders placed and dollars expended," because the BPA explicitly marks the required purchase amount for each item as "0.00." *See id.* at 4; *see also* Gov't MTD, Ex. 1 (BPA) at 3–7 (indicating "0.00" as the required "Amount" of each item).

Assuming the BPA is a contract, and arguing NOAA owed contractual duties to Kennedy under the BPA, Kennedy seeks to recover from NOAA for an alleged breach of the implied duty of good faith and fair dealing. *See* Pl.'s Resp. at 11–12. Specifically, Kennedy asks the Court to find NOAA's conduct as a typical "bait and switch case" because NOAA "evaded the spirit of the bargain" by "compelling" Kennedy to meet burdensome obligations (i.e., buying inventory in advance to meet Tier 1 orders) while "fail[ing] to live up to its own end" by "refus[ing] to make meaningful orders under the [BPA]." *Id.* at 12. In reply, the government emphasizes "the plain terms of the BPA" indicate the BPA is not a contract and does not require any minimum purchase amount, thereby debunking Kennedy's bait and switch theory. *See* Gov't Reply at 5; *see also* Gov't MTD, Ex. (BPA) at 3–7 (indicating "0.00" as the required "Amount" of each item). Accordingly, the government seeks to "dismiss Kennedy's good faith and fair dealing claim for failure to state a claim." *See* Gov't Reply at 5.

### IV. Applicable Law

When resolving a motion to dismiss under both RCFC 12(b)(1) and 12(b)(6), the Court engages in two independent inquiries: jurisdiction under the Tucker Act exists if the statute forming the basis of the complaint (1) "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained" and (2) is "reasonably amenable to the reading that it mandates a right of recovery in damages." *See Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1306–07 (Fed. Cir. 2008) (citations and internal quotation marks omitted) (holding when considering a motion to dismiss, "the merits of the claim [are] not pertinent to the jurisdictional inquiry"). When considering a motion to dismiss under RCFC 12(b)(1), a "plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *Inter-Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1337–38 (Fed. Cir. 2020) (quoting *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010)) (internal quotation marks omitted). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences

in favor of the plaintiff." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)) (internal quotation marks omitted).

When considering a motion to dismiss under RCFC 12(b)(6), the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The Court cannot rely on "conclusory statements" and legal assertions when determining whether the complaint contains sufficient allegations to "plausibly" claim breach of trust. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A complaint should not be dismissed for failure to state a claim, unless the complaint fails to state a claim to relief that is plausible on its face." *Inter-Tribal Council of Ariz.*, 956 F.3d at 1338 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). The complaint is facially plausible if the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell*, 550 U.S. at 556).

The elements of a binding contract are the same for express and implied contracts. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The elements of contract formation for federal government contracts are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003); *see Ravi v. United States*, 104 F.4th 1359, 1369 (Fed. Cir. 2024); *Trauma*, 104 F.3d at 1325; *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990).

## V. Whether the BPA is a Binding Contract

Kennedy advances several theories as to why the BPA should be interpreted as a binding contract and not merely a framework for future purchases, thus conferring subject-matter jurisdiction to the Court. *See* Pl.'s Resp. at 5–8. Per Kennedy, the BPA is sufficiently unique from other typical BPAs and should be construed as a binding contract with enforceable contractual obligations. *See id.* at 5–6. Kennedy urges the Court to infer mutuality of consideration from several "express and implied" provisions of the BPA, and hold the BPA is a binding contract. *See id.* at 6–8. Alternatively, if the Court is unpersuaded by these arguments, Kennedy likens the BPA to a requirements contract, suggesting the Court should find the BPA falls within an exception to the consideration requirement and is still a binding contract. *See* Tr. at 12:18–23. Finally, Kennedy suggests the BPA could be interpreted as an infinite quantity contract with an implied minimum purchase requirement given the BPA's $13 million expected value. *See* Tr. at 39:20–40:12. Considering these arguments, the Court first analyzes the BPA and its characteristics; it then addresses each of Kennedy's arguments in turn to determine whether the BPA can be construed to be a binding contract.

### A. The Factual Characteristics of the BPA

With the factual summaries discussed *supra* Section I in mind the Court reviews the BPA a and considers its irregularities. As the government admitted, the BPA is an atypical BPA because its language is "not the most elegant" when compared to other typical BPAs. *See* Tr. at 41:18–23. In fact, the government routinely uses BPAs as a means of establishing a supply channel for future needs when the quantity is unknown. *See supra* Section I. The parties further agree government agencies typically use BPAs to serve as "a framework for future contracts" via individual call orders placed by the government. *See* Pl.'s Resp. at 6; *see also* Pl.'s Reply at 2; Gov't MTD at 5 (quoting *Zhengxing v. United States*, 204 F. App'x 885, 886–87 (Fed. Cir. 2006) ("[A BPA] is merely a framework for future contracts and only creates a contractual obligation with regard to accepted orders.")). Importantly, BPAs are different from contracts because, unlike contracts, in BPAs the "[f]uture terms are spelled out, but performance is not guaranteed." *See Crewzers Fire Crew Transp., Inc. v. United States*, 98 Fed. Cl. 71, 79 (2011) (citing *Mod. Sys. Tech. Corp. v. United States*, 979 F.2d 200, 204 (Fed. Cir. 1992)).

In typical BPAs, the government places "individual purchase orders" under an "umbrella contract," thereby making each call order a contract, rather than the BPA serving as a contract. *See* Pl.'s Resp. at 6. Here, consistent with government practice, NOAA used the BPA to ensure NOAA could quickly address unknown future needs, namely PPE and cleaning supplies during the COVID-19 pandemic. *See* Tr. at 55:18–57:11; *see also* Gov't MTD, Ex. 1 (BPA) at 11 ("[NOAA] seeks to procure [PPE and cleaning supplies] . . . to ensure federal employees, contractors and guests are protected from any COVID-19 Virus introduction."). The BPA lists various PPE materials and supplies covered by the BPA. *See id.* at 3–7, 13 (listing hand sanitizers, face masks, disposable gloves, face shields, and more). The BPA further lists "0.00" as the minimum purchase quantity required for each item, *see id.* at 3–7, and the parties agree the BPA did not include any provision compelling NOAA to purchase items during the designated performance period, *see* Complaint ¶ 5. *See also* Gov't MTD at 8. The parties also agreed to leave "[a]ll applicable deliverables and their required delivery dates, destination of delivery, and schedule for delivery" to "be specified in individual call orders issued under this BPA." *See* Gov't MTD, Ex. 1 (BPA) at 13. The delivery locations enumerated in the BPA included major cities across the United States, such as Alaska and Puerto Rico. *See id*. Delivery under the BPA depended on a "tiered schedule" where the most urgent Tier 1 orders were to be delivered within five-to-ten days of a call order, while the least urgent Tier 7 orders could be delivered "within 91+ days" of a call order. *See id.* at 12. The BPA required Kennedy to "immediately notify" the CO if Kennedy encountered or anticipated "difficulty in meeting performance requirements" or "complying with the BPA and/or call order delivery schedule." *See id.* at 16. The BPA further included a F.O.B. provision, making Kennedy "responsible for any loss of and/or damage to the goods[] [o]curring before delivery to the carrier." *See id.* at 14–15 (quoting FAR 52.247–29(b)(4)(i)); Tr. at 66:15–21 ("[THE COURT:] When it entered into the BPA, what was Kennedy's understanding of the risk of loss and the FOB clauses in the BPA? . . . [PLAINTIFF:] I'm sure their understanding was consistent with the language of . . . those clauses."); Tr. at 69:9–20 ("[THE COURT:] [D]o the risk of loss provisions . . . assume that the expiration of the materials or anything that occurs to them when under the custody of [p]laintiff prior to a call order would be on [p]laintiff? [GOVERNMENT]: Yeah, that's the way we read it, and that's the only language in this BPA that speaks at all to this issue.").

The BPA, however, contains some irregularities.  For example, as the government acknowledged at oral argument, the BPA refers to itself as a "contract" throughout its provisions.  *See, e.g.*, Gov't MTD, Ex. 1 (BPA) at 12 (stating "this contract (i.e. Blanket Purchase Agreement)"); *see also* Tr. at 40:13–41:5 ("THE COURT:  From the [g]overnment's perspective, if the [g]overnment did not intend for the BPA to itself serve as a contract, then why does the BPA internally keep referring to itself as a 'contract'?  [GOVERNMENT]:  Well, . . . it also says blanket purchase agreement a number of times . . . .  The solicitation was for a blanket purchase agreement . . . both sides understood this was a blanket purchase agreement."); Gov't MTD, Ex. 1 (BPA) at 14 ("All deliverables required under this BPA . . . ."), 16–17 (requiring notice of delay "in complying with the BPA and/or call order delivery schedule," which "shall not be construed as a waiver . . . under this contract.").  The BPA does not address what happens if Kennedy rejected a call order, or whether Kennedy could reject a call order—a point the government disputes.  *See* Tr. at 28:21–29:20 ("THE COURT:  Is there a specific provision in the BPA that says Kennedy can[] reject call orders? . . .  [PLAINTIFF:]  I looked through the BPA to find something that said that Kennedy . . . has the right to accept and, therefore, the right to reject a call order . . . .  I looked here for something that would give . . . Kennedy, that right, and there's nothing there.").  The government, however, does not dispute the BPA is silent on Kennedy's ability or inability to reject call orders.  *See* Tr. at 30:19–24 ("[THE COURT:] [W]hat provision of the [BPA] allows Kennedy to reject call orders?  [GOVERNMENT]:  There is not a specific provision one way or another. . . .  I don't dispute that there's a particular provision that states that."); Tr. at 28:10–14 ("[THE COURT:]  Kennedy could reject call orders? [GOVERNMENT]:  Yes, and that is consistent with the vast majority of BPAs.").  Kennedy agreed the BPA lacks specific terms addressing the ability to reject a call order and whether rejection would constitute a breach.  *See* Tr. at 32:18–33:6 ("[THE COURT:]  [N]ot only does [the BPA] not have a provision to say Kennedy cannot reject call orders, it doesn't have a provision to describe what happens if there's a breach for rejecting a call order.  [PLAINTIFF]:  Right.  I agree . . . the [BPA] lacks those things, and I maintain, however, that there's no requirement that the [BPA] contain those things . . . the common law would afford a remedy in the event of breach and . . . the lack of a right to reject a call order can only be interpreted as the failure to perform a conditional contract when called upon to perform, the condition to performance having been satisfied."); *see also* Tr. at 32:1–14 ("THE COURT:  If they breached, yeah, what happens then?  What does the contract specify?  [PLAINTIFF]:  Well, I don't know if it's necessary for the contract to specify the consequences of breach.  They could leave it to the common law . . . . [THE COURT:]  But you agree, in addition to not having a provision that explicitly says '[P]laintiff has no ability to reject call orders,' that there's also no provisions related to what happens if [P]laintiff breaches and there is a call order rejected, what would the damages be? . . .  [PLAINTIFF:]  I agree.").  With these nuances in mind, the Court next analyzes whether the BPA can be construed as a contract and distinguished from other typical BPAs.

### B.  Whether the BPA Creates Mutuality of Consideration

Having analyzed the BPA's characteristics, the Court now determines whether there is sufficient mutuality of consideration to create a binding contract.  Specifically, to establish the BPA is a binding contract, Kennedy must identify mutuality of consideration arising from the BPA's terms.  Kennedy offers several theories as to why the Court should find mutuality of

- 10 -

consideration sufficient to create contractual duties for both parties, thereby conferring subject-matter jurisdiction to the Court. *See* Pl.'s Resp. at 5–8. Each theory, however, requires the Court to ignore the plain text of the BPA and to infer mutual obligation where none exists. *See id.* First, Kennedy argues the tiered delivery schedule creates sufficient mutuality of consideration by obligating Kennedy to pre-purchase supplies before NOAA placed any orders. *See id.* at 6–7. Kennedy then argues its alleged inability to reject call orders also constitutes sufficient mutuality of consideration to create a contractual obligation between the parties. *See id.* at 7. Finally, Kennedy argues mutuality of consideration exists because NOAA was obligated to purchase an implied, reasonable minimum quantity of goods in exchange for the alleged obligations placed on Kenney. *See id.* at 8.

Kennedy argues the BPA is a contract because its terms create sufficient mutuality of obligation to constitute consideration through "strict and exceedingly onerous 'time for delivery' requirements," mandating Kennedy to acquire inventory to meet Tier 1 deliveries before any order was even placed. *See* Pl.'s Resp. at 7*; see also* Gov't MTD, Ex. 1 (BPA) at 12 (requiring delivery "within 5 - 10 days" of a call order under Tier 1). The Federal Circuit traditionally treats BPAs as "illusory promises that do not impose obligations on either party," rather than binding contracts. *Crewzers Fire Crew Transp., Inc. v. United States*, 741 F.3d 1380, 1382–83 (Fed. Cir. 2014). BPAs are best understood as "frameworks for future contracts—'a set of ground rules as it were, and no obligations are assumed by either party *until orders are given* by the Government and accepted by the contractor.'" *Id.* at 1381 (quoting *Mod. Sys.*, 979 F.2d at 204) (emphasis added). If a party never places an order under a BPA, no obligation is ever created necessitating the other party to act. *See Mod. Sys.*, 979 F.2d at 202; *see also McLeod Grp. LLC v. United States*, 840 F. App'x 525, 528–29 (Fed. Cir. 2020) ("The issuance of task orders pursuant to [a] BPA, while themselves presumably contracts, does not transform [a] BPA into a contract."); *Zhengxing*, 204 F. App'x at 887 ("*Once* an order is placed under the agreement, a contract is created with respect to that order . . . ." (emphasis added)). At oral argument, Kennedy admitted BPAs are not typically binding contracts. *See* Tr. at 24:14–17 ("THE COURT: Does the case law not typically show that BPAs are not binding contracts? [PLAINTIFF]: Typically they're incomplete contracts."). Here, the BPA does not obligate Kennedy to do anything *before* a call order is placed, so Kennedy's pre-purchased inventory cannot be interpreted as a contractual obligation arising from the BPA's tiered-delivery framework. *See generally* Gov't MTD, Ex. 1 (BPA) at 11–18. Kennedy must act *only after* a call order is placed, and *only then*, would Kennedy be obligated by the five-day fulfillment requirement. *See id.* at 12 (requiring "Tier 1: Delivery" to be performed "within 5 - 10 days" of when NOAA places a call order).

Kennedy's argument the BPA's terms necessitated the preemptive inventory purchase to fill hypothetical Tier 1 call orders, even if true, is not sufficient to prove mutuality of obligation to establish consideration, because the government was not obligated to do anything until *after* it placed a call order. *See generally id.* at 12–17. The Court thus declines to infer a mutual obligation where none explicitly exists in the BPA. *See Crewzers*, 741 F.3d at 1381–83. Neither party was obligated to act before a call order was placed, so there is insufficient mutuality of obligation here to establish consideration. *See id.* at 1382–83 ("It is axiomatic that a valid contract cannot be based upon the illusory promise of one party, much less illusory promises of both parties." (quoting *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1062 (Fed. Cir. 2002)

(citing Restatement (Second) of Contracts § 71(1))); *see also id.* at 1381 (construing BPAs as "frameworks for future contracts—'a set of ground rules as it were, and no obligations are assumed by either party until orders are given by the Government and accepted by the contractor'" (quoting *Mod. Sys.*, 979 F.2d at 204)); *Ridge*, 287 F.3d at 1060 (noting the agreement's language "does not guarantee there will be a need for the equipment offered nor does it guarantee orders will be placed against the awarded agreements").

   Kennedy further argues it lacked the ability to reject call orders, which in turn obligated the government to place call orders, thereby creating mutuality of consideration. *See* Pl.'s Resp. at 7. Pursuant to Federal Circuit precedent, a binding contract is created when an order is placed under a BPA. *See Crewzers*, 741 F.3d at 1381 ("[N]o obligations are assumed by either party until orders are given by the Government." (quoting *Mod. Sys.*, 979 F.2d at 204)); *see also Mod. Sys.*, 979 F.2d at 204 ("[T]he basic agreement itself is not a contract, and does not become a contract except to the extent that orders are issued under it." (quoting 2 J. McBride & T. Touhey, Government Contracts § 18.70 (1984))). The government understood the BPA allowed Kennedy to reject call orders, as is the case with most BPAs. *See* Tr. at 28:10–14 ("[THE COURT:] Kennedy could reject call orders? [GOVERNMENT]: Yes, and that is consistent with the vast majority of BPAs."). When pressed at oral argument as to whether Kennedy's lack of ability to reject call orders constitutes consideration, the government acknowledged an obligation to accept "could create consideration." Tr. 26:21–24; *see* Tr. at 26:19–27:15 ("[THE COURT:] [I]f there is an obligation to accept, that creates consideration? [GOVERNMENT]: I mean, it's possible that that could create consideration, sure."). Yet, Kennedy could not point to anywhere in the BPA explicitly prohibiting Kennedy from rejecting a call order. *See* Tr. at 28:21–29:20 ("THE COURT: Is there a specific provision in the BPA that says Kennedy can[] reject call orders? . . . [PLAINTIFF]: I looked through the BPA to find something that said that Kennedy . . . has the right to accept and, therefore, the right to reject a call order . . . . I looked here for something that would give . . . Kennedy, that right, and there's nothing there."); *see also* Tr. at 36:17–23 ("THE COURT: Let's assume that the Court reads this [BPA] as giving [p]laintiff the allowance to reject call orders. Would you agree that . . . destroys the consideration for making the BPA enforceable? [PLAINTIFF]: . . . [I]t's not going to help my position."). Further, Kennedy cites no caselaw supporting the proposition the terms of a BPA may be so "strict and exceedingly onerous" to constructively create consideration by mutuality of obligation. *See generally* Pl.'s Resp. at 6–7. The only contractual obligations under the BPA expressly binding Kennedy to terms of performance are triggered *after* NOAA places a call order.[4] The Court declines to infer constructive consideration where the BPA is silent as to Kennedy's ability to reject call orders. *See Crewzers*, 741 F.3d at 1381 ("[N]o obligations are assumed by either party until orders are given by the [g]overnment." (quoting *Mod. Sys.*, 979 F.2d at 204)); *see also Ridge*, 287 F.3d at 1060 (noting the agreement's language "does not guarantee there will be a need for the equipment offered nor does it guarantee orders will be placed against the awarded agreements"); *Mod. Sys.*, 979 F.2d at 204 ("[T]he basic agreement itself is not a contract, and does not become

---

[4] Nothing in the BPA explicitly forbids Kennedy from rejecting call orders. *See, e.g.*, Gov't MTD, Ex. 1 (BPA) at 16–17 ("In the event the Contractor encounters difficulty in meeting performance requirements, or when it anticipates difficulty in complying with the BPA and/or call order delivery schedule or completion date, or as soon as the Contractor has knowledge that any actual or potential situation is delaying or threatens to delay the timely performance of this BPA and/or call order, the Contractor shall immediately notify the [CO] and the [CO]'s Representative, in writing . . . . [T]his term shall not be construed as a waiver by the [g]overnment of any delivery schedule or date, or any rights or remedies provided by law or under this contract.").

a contract except to the extent that orders are issued under it." (quoting 2 J. McBride & T. Touhey, Government Contracts § 18.70 (1984))).

Kennedy additionally urges the Court to find an implied "reasonable" minimum quantity of goods NOAA had to purchase is sufficient to create mutuality of consideration between the parties. *See* Pl.'s Resp. at 8. Kennedy argues by procuring Kennedy as a vendor, NOAA led Kennedy to believe orders would be placed, thereby obligating NOAA to make a "reasonable" number of purchases for some "reasonable" amount of money, given the government set the BPA's expected value at $13 million. *See id.* Absent terms specifically requiring action by a party, BPAs do not create an obligation on the part of the promisor to purchase some minimum quantity of goods. *See Crewzers*, 741 F.3d at 1381 ("Because of the sporadic and unpredictable nature of wildfires and other emergencies, the Forest Service did not make any guarantee that it would actually place orders under these BPAs."); *Ridge*, 287 F.3d at 1060 (noting the agreement's language "does not guarantee there will be a need for the equipment offered nor does it guarantee orders will be placed against the awarded agreements"); *Mod. Sys.*, 979 F.2d at 204 ("In such an agreement, there is nothing in writing which requires the government to take any ascertainable quantity or amount.") (quoting Donald Gavin, *Government Requirement Contracts*, 5 PUB. CONT. L.J. 243, 246 (1972)). The BPA does not set a minimum—or even an estimated—quantity of goods NOAA was expected to order. *See generally* Gov't MTD, Ex. 1 (BPA) at 3–7. Rather, the opposite is true; the BPA explicitly set the required "amount" to be purchased for each item to zero. *See id.* (indicating "0.00" as the required "Amount" to be purchased of each item). Kennedy could not articulate a specific non-zero quantity of goods NOAA was required to purchase. *See* Tr. at 13:8–24 ("THE COURT: So [NOAA] could have purchased zero goods? [PLAINTIFF]: No, they couldn't purchase zero goods. THE COURT: So how much, though? One million? [PLAINTIFF]: Well, they purchased 600,000. Our position is that [NOAA] had an obligation to purchase a reasonable amount of goods given the $13 million estimate."). Kennedy further admitted the government's BPAs typically serve this precise purpose—as a framework for the government to address its future needs. *See* Tr. at 8:6–11 ("THE COURT: Yeah, I don't want to talk about this BPA. I just want to talk about why BPAs are used generally, because [p]laintiff would agree that a BPA typically serves as a purchase agreement framework for future purposes. [PLAINTIFF]: Yes, sir."). Further, the quantity terms are left to the individual call orders, consistent with the government's usage of BPAs within the context of unknown emergency needs. *See* Gov't MTD, Ex. 1 (BPA) at 3–7 (indicating "0.00" as the required "Amount" to be purchased of each item). Given Kennedy's inability to articulate a minimum purchase requirement, the Court declines to infer such a requirement into the BPA's otherwise clear provisions setting the required amount at "0.00." *See id.*; *see also Ridge*, 287 F.3d at 1060 (noting the agreement's language "does not guarantee there will be a need for the equipment offered nor does it guarantee orders will be placed against the awarded agreements"). Kennedy cannot rely on a non-zero minimum purchase requirement to demonstrate consideration to make the BPA a binding contract. *See Crewzers*, 741 at 1382–83 (holding BPAs, unlike contracts, are "illusory promises that do not impose obligations on either party" because the government "is not required under the terms of the BPAs to place any orders"); *see also id.* at 1381 (construing BPAs as "frameworks for future contracts—'a set of ground rules as it were, and no obligations are assumed by either party until orders are given by the Government and accepted by the contractor'") (quoting *Mod. Sys.*, 979 F.2d at 204).

      C.      **Whether the BPA is a Requirements Contract Creating Consideration**

      As an exception to the general rule that BPAs lack mutuality of consideration, a BPA may still be binding if it constitutes a requirements contract. "A requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract." *Mod. Sys.*, 979 F.2d at 205 (citation omitted). As opposed to a typical BPA, an agreement promising the contractor an exclusive right to supply goods to the promisor constitutes the requisite consideration to be a binding requirements contract. *See Ace-Federal Reps., Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000) (holding the government's promise to "purchase only from the contractors on the schedule, with few exceptions" constituted "consideration for the contractors' promises regarding price, availability, delivery, and quantity"). While admitting the BPA "is styled" as a BPA, Kennedy argues the BPA's "express and implied terms" satisfy "the mutuality of consideration element that may traditionally be lacking in [BPAs]." *See* Pl.'s Resp. at 5. Unlike the express exclusivity language in *Ace-Federal*, however, the BPA here contains no language requiring NOAA to fulfill *all* its PPE needs from Kennedy alone. *Compare* Gov't MTD, Ex. 1 (BPA) at 12 ("The Contractor shall deliver materials and supplies with the following specifications."), *with Ace-Federal*, 226 F.3d at 1331 ("[E]xcept as this contract otherwise provides, the Government shall order from the Contractor *all* the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the schedule." (quoting 48 C.F.R. § 52.216–21(c) (1988)) (emphasis added)). At oral argument, the government confirmed Kennedy was NOAA's exclusive PPE supplier, but nothing in the BPA prevented NOAA from sourcing supplies elsewhere. *See* Tr. at 37:14–38:9 ("THE COURT: Did the BPA in this case limit the [g]overnment to only purchasing supplies from Kennedy? [GOVERNMENT]: No, . . . I don't believe there's anything in the BPA in that regard."); *see generally* Gov't MTD, Ex. 1 (BPA). Even more, the government explained it is common practice for the government to go elsewhere if a contractor cannot fulfill a call order. *See* Tr. at 37:18–38:9 ("THE COURT: What language in the BPA allows NOAA to consider other sources for supply? [GOVERNMENT]: I don't know that there's specific language of that sort, but . . . that is the standard way that . . . a blanket purchase agreement works, that if for whatever reason call orders are placed, the contractor can't fulfill it, the [g]overnment goes elsewhere.").

      At oral argument, Kennedy argued the BPA "was *almost* like a requirements contract," while conceding the government "did not have an obligation to purchase a specific dollar amount of goods from [Kennedy] under this BPA." Tr. at 12:18–13:7 (emphasis added). Still, Kennedy urged the Court to ignore the text of the BPA and interpret the text as "necessarily imply[ing]" Kennedy was the exclusive supplier for the entirety of NOAA's PPE needs. *See* Tr. at 39:12–19. The government disagreed, insisting the BPA was "not a requirements contract" because "the [g]overnment was not precluded from going elsewhere" but emphasizing NOAA "did not go elsewhere" for PPE supplies. *See* Tr. at 37:14–38:9. Even if the BPA was like a requirements contract, here, the parties' agreement that the BPA was not a requirements contract destroys any potential consideration. *See* Tr. at 12:18–13:7; Tr. at 37:14–38:9. Not only is the BPA silent as to exclusivity, at oral argument, Kennedy conceded it was not aware of any representation from NOAA that Kennedy would serve as the government's exclusive supplier. *See* Tr. at 39:4–7 ("THE COURT: So from [p]laintiff's perspective, though, during the course of performance, was there any communication about exclusivity? [PLAINTIFF]: Not that I'm aware of."); *see*

*generally* Gov't MTD, Ex. 1 (BPA).  Given the BPA's silence as to exclusivity, and the parties' agreement that the BPA did not expressly set forth an exclusive arrangement, the Court declines to interpret such an arrangement into the BPA.  Accordingly, any alleged exclusivity arrangement cannot serve as the consideration necessary to form a requirements contract as the BPA did not address exclusivity.  *See Mod. Sys.*, 979 F.2d at 205 ("A requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract."); *but see Ace-Federal*, 226 F.3d at 1332 (holding the government's promise to "purchase only from the contractors on the schedule, with few exceptions" constituted "consideration for the contractors' promises regarding price, availability, delivery, and quantity").

        **D.**       **Whether the BPA is an Indefinite Quantity Contract**

Given the BPA's $13 million expected value, Kennedy argues the "onerous" tiered-delivery schedule necessitated Kennedy's pre-purchase of inventory and obligated NOAA to place a "reasonable" number of orders.  *See* Pl.'s Resp. at 8.  An indefinite quantity contract "is another form of variable quantity contract in which the government obligates itself to buy, or, in this case, sell, at least a stated minimum quantity."  *Carter v. United States*, 102 Fed. Cl. 61, 68 (2011) (citing *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 799 (Fed. Cir. 2002)).  The Federal Circuit holds "a contract lacking [a minimum quantity] term cannot be construed as a valid indefinite quantity contract."  *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (citing *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 493 (1923)).  Here, Kennedy cannot state a quantity of orders the government was contractually obligated to place, resorting instead to nebulous approximations like "a reasonable number of purchases for some reasonable amount of money."  *See* Pl.'s Resp. at 8; *see also* Tr. at 15:15–16:2 ("[THE COURT:]  You're saying it's not 13 million, it's not zero, it's not 600,000.  You'll take 3 million. [PLAINTIFF]:  I'm telling you it's a reasonable amount.  I mean, if you want me to -- I'm unable to attach a dollar amount. . . .  I don't think the law requires the level of purchasing to be down to the dollar . . . for there to be a valid, enforceable contract.").  "If there is nothing in the writing which required the Government to take any ascertainable quantity, it must be held that, for lack of consideration and mutuality, the contract was not enforceable as an indefinite quantity contract."  *Coyle's*, 154 F.3d at 1306 (cleaned up) (quoting *Willard*, 262 U.S. at 493).  Given Kennedy cannot point to an ascertainable non-zero quantity term here, the BPA cannot be construed as an indefinite quantity contract.  *See id.* ("[T]his court cannot read this agreement as an indefinite quantity contract because it lacks a minimum quantity term.  Regardless of whether the contract is susceptible to interpretation as an indefinite quantity contract, a contract lacking [a minimum quantity] term cannot be construed as a valid indefinite quantity contract.").

**VI.**    **Whether Kennedy Fails to State a Claim Upon Which Relief of Equitable Adjustment Can Be Granted**

Assuming the BPA is an enforceable contract, Kennedy asserts it is entitled to an equitable adjustment of the terms of that contract.  *See* Pl.'s Resp. at 8–11.  Kennedy advances a "constructive change" theory, arguing when a contractor performs work beyond the contract requirements either by informal order or due to the fault of the government, this constitutes a

"constructive change" to the contract.  *See id.* at 9–11 (citing *E. Coast Repair & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1028–29 (E.D. Va. 2016), and *The Redland Co. v. United States*, 97 Fed. Cl. 736, 755 (2011)).  Applying this reasoning, Kennedy concludes the Tier 1 delivery schedule caused Kennedy to incur additional work of pre-ordering the supplies in anticipation of orders beyond the terms of the BPA, constituting a "constructive change" to the contract and entitling Kennedy to equitable adjustment.  *See id.* at 9–11; *see also* Gov't MTD, Ex. 1 (BPA) at 12 (mandating delivery "within 5 - 10 days" of a call order under Tier 1).

      To show entitlement to an equitable adjustment of a government contract plaintiff must show "liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991).  Plaintiff must also "prove that the government somehow delayed, accelerated, augmented, or complicated the work, and thereby caused [plaintiff] to incur specific additional costs, and that those costs were reasonable, allowable, and allocable to the contract." *SAB Constr., Inc. v. United States*, 66 Fed. Cl. 77, 84–85 (2005) (emphasis omitted) (citation omitted), *aff'd*, 206 F. App'x 992 (Fed. Cir. 2006).  Here, Kennedy's argument for equitable adjustment assumes the BPA is a binding contract.  *See* Pl.'s Resp. at 5, 8.  As previously discussed, each of Kennedy's theories as to the existence of a contract fails for lack of consideration.  *See supra* Section V.  Even if the BPA were a binding contract, Kennedy cannot show liability on NOAA's part because the BPA implies no duty owed by NOAA that was not performed, nor can Kennedy point to anywhere in the BPA alleging breach of an alleged duty. *See* Compl. at ¶¶ 29–32.  Kennedy purchased $2.1 million in startup inventory absent any express or implied requirement in the BPA, which made clear Kennedy was "responsible for any loss of . . . goods[] [o]ccurring before delivery to the carrier."  *See* FAR 52.247-29(b)(4)(i), F.O.B. Origin, Gov't MTD, Ex. 1 (BPA) at 14–15 ("The Contractor shall . . . [b]e responsible for any loss of and/or damage to the goods[] [o]ccurring before delivery to the carrier."); Tr. at 66:15–21 ("[THE COURT:]  When it entered into the BPA, what was Kennedy's understanding of the risk of loss and the FOB clauses in the BPA? . . . [PLAINTIFF:]  I'm sure their understanding was consistent with the language of . . . those clauses."); Tr. at 69:9–20 ("[THE COURT:]  [D]o the risk of loss provisions . . . assume that the expiration of the materials or anything that occurs to them when under the custody of [p]laintiff prior to a call order would be on [p]laintiff? [GOVERNMENT]:  Yeah, that's the way we read it, and that's the only language in this BPA that speaks at all to this issue."); *see also George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 245–46 (2005) ("No presumption of reasonableness shall be attached to the incurrence of costs by a contractor.") (quoting 48 C.F.R. § 31.201-3(a) (2004)).  The Court will not read implied duties into the BPA where none exist, nor will the Court reassign responsibility where the BPA allocates pre-delivery costs to Kennedy alone.  Since Kennedy cannot show liability, Kennedy cannot state a claim upon which the Court can grant an equitable adjustment. *See Servidone*, 931 at 861 ("To receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury."); *see also SAB*, 66 Fed. Cl. at 84–85.

## VII.    Whether Kennedy Fails to State a Claim for Breach of Good Faith and Fair Dealing

      Kennedy asserts the necessary pre-purchase of inventory in expectation of call orders, coupled with NOAA's alleged unreasonably low purchase amount, satisfies Kennedy's burden to prove NOAA breached the duty of good faith and fair dealing.  *See* Pl.'s Resp. at 11–12.

Kennedy asks the Court to hold this is a typical bait and switch case, because NOAA "evaded the spirit of the bargain" by "compelling" Kennedy to meet burdensome obligations (i.e., buying inventory in advance to meet Tier 1 orders) while "fail[ing] to live up to its own end" by "refus[ing] to make meaningful orders under the [BPA]." *See id*. at 12. Per Kennedy, the BPA effectively "compel[ed] Kennedy to procure large amounts of inventory to meet the onerous delivery demands," while NOAA purchased a quantity of supplies lower than the parties' "reasonable expectations" or the BPA's "implied obligations." *See id.* Thus, Kennedy seeks to recover from NOAA for breach of the duty of good faith and fair dealing contractually owed to Kennedy. *See id.* at 11–12.

The Federal Circuit instructs "a specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019). "The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). Instructively, "what that duty entails depends in part on what that contract promises (or disclaims)." *Id.* at 830. In "bait and switch cases," the government may be liable for damages only when "government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *See id.* at 829. In cases where "the government has been found to violate the implied duty of good faith and fair dealing," the government first "enters into a contract that awards a significant benefit in exchange for consideration," and then "the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract." *Id.*

Kennedy's good faith and fair dealing claim hinges on the existence of a valid contract, which the BPA is not. *See supra* Section V. Even if the BPA was a binding contract, the BPA contained no "specific promise" by NOAA to purchase a non-zero amount of goods, and Kennedy concedes the BPA contained no minimum purchase requirement. *See* Pl.'s Resp. at 7; *see also* Tr. at 11:25–12:12 ("[PLAINTIFF:] There wasn't a promise. We're not contending that there was a promise on the part of the [g]overnment to purchase $13 million worth of goods from us. Our contention is that there was a promise on behalf of the [g]overnment to purchase up to $13 million worth of goods from us."). By its plain terms and as discussed *supra* Section V, the BPA indicates it is not a contract and explicitly set the required purchase quantity of each item at "0.00," thus precluding the Court from holding an implied agreement between the parties to a non-zero purchase requirement. *See* Gov't MTD, Ex. 1 (BPA) at 3–7 (indicating "0.00" as the required "Amount" to be purchased of each item covered by the BPA); *see also Precision*, 596 F.3d at 830 ("[A] party asserting an implied [requirement] 'must establish that, based on the circumstances at the time of contracting, there was an implied agreement between the parties to provide the undertakings the petitioners allege.'" (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 424–25 (1996))).

Further, as discussed *supra* Section V, Kennedy has not established mutuality of consideration sufficient to prove NOAA used the BPA to award itself "a significant benefit in exchange for consideration." *See Precision*, 296 F.3d at 929. NOAA did not have insight into whether Kennedy would need to pre-purchase supplies; as far as NOAA knew, Kennedy already

- 17 -

had a warehouse of supplies ready to sell at the time the parties entered into the BPA. *See* Tr. at 46:21–47:4 ("[GOVERNMENT]: As far as the [g]overnment knows, the contractor could . . . have a warehouse that always has the goods necessary to fulfill any order. It could be any kind of contractor. You know, the terms of the deal are not based on the specific situation of any particular contractor. Otherwise, you would have implied duties to some contractors that . . . you wouldn't have to other contractors on the same exact contract terms."). No evidence—before or after the BPA took effect—suggests NOAA ever indicated to Kennedy that NOAA would place Tier 1 call orders for PPE and cleaning supplies of a certain quantity. *See id*. Kennedy alone decided to purchase $2.1 million in inventory to meet a hypothetical demand, and under the BPA, bore the risks of that decision. *See* FAR 52.247-29(b)(4)(i), F.O.B. Origin, Gov't MTD, Ex. 1 (BPA) at 14–15 ("The Contractor shall . . . [b]e responsible for any loss of and/or damage to the goods[] [o]ccurring before delivery to the carrier."); Tr. at 66:15–21 ("[THE COURT:] When it entered into the BPA, what was Kennedy's understanding of the risk of loss and the FOB clauses in the BPA? . . . [PLAINTIFF:] I'm sure their understanding was consistent with the language of . . . those clauses."). No BPA term compelled Kennedy to pre-purchase the supplies, and no duty to purchase a minimum amount can be inferred. *See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998). Given the BPA is not a contract, and the Court cannot read implied obligations into the BPA where none exist nor "extend" the terms of the BPA "to create obligations not contemplated" in the BPA, there can be no breach of the duty of good faith and fair dealing. *See id.* ("[I]mplied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated in the contract."); *see also Dobyns*, 915 F.3d at 739 (holding "a specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated"); *Precision*, 596 F.3d at 831 ("The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.").

### VIII. Conclusion

For the foregoing reasons, the Court **GRANTS** the government's Motion to Dismiss, ECF No. 7. The Clerk is **DIRECTED** to enter judgment dismissing the case.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge